JUDGE CROTTY

**13 CV 6134**

McElroy, Deutsch, Mulvaney & Carpenter, LLP
88 Pine Street, 24th Floor
New York, NY 10005
Tel: (212) 483-9490
Attorneys for Plaintiff
International Transport Management Corp.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL TRANSPORT MANAGEMENT CORP., on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>        vs.<br><br>KAWASAKI KISEN KAISHA, LTD., "K" LINE AMERICA, INC., MITSUI O.S.K. LINES, LTD., MITSUI O.S.K. BULK SHIPPING (USA), INC., NIPPON YUSEN KABUSHIKI KAISHA, NYK LINE (NORTH AMERICA) INC., TOYOFUJI SHIPPING CO., LTD., WILH. WILHELMSEN HOLDING ASA, WILH. WILHELMSEN ASA, WALLENIUS LINES AB, WALLENIUS WILHELMSEN LOGISTICS AS, WALLENIUS WILHELMSEN LOGISTICS AMERICAS, LLC, EUKOR CAR CARRIERS INC., AMERICAN SHIPPING & LOGISTICS GROUP, INC., AMERICAN ROLL-ON ROLL-OFF CARRIER, LLC, COMPAÑÍA SUD AMERICANA DE VAPORES S.A., CSAV AGENCY NORTH AMERICA, LLC,<br><br>        Defendants. | Civil Action No.<br><br><br>CLASS ACTION COMPLAINT and DEMAND FOR TRIAL BY JURY |

Plaintiff International Transport Management Corp., on behalf of all persons and entities in the United States that purchased Vehicle Carrier Services directly from any Defendant (or any current or former subsidiary or affiliate thereof) or any of their agents or co-conspirators between January 1, 2008 and the present, brings this class action for treble damages, injunctive relief and other relief including the costs of suit and reasonable attorneys' fees, for its injuries and those of the Class (defined at ¶ 89) resulting from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Plaintiff makes these allegations based upon its own personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel.

## I.    NATURE OF THE ACTION

1.      This lawsuit is brought against the major providers of Vehicle Carrier Services (defined below individually and collectively as "Defendants") globally and in the United States, for engaging in a conspiracy during the relevant period (defined at ¶ 5) to fix, raise, maintain and/or stabilize prices, and allocate the market and customers in the United States for Vehicle Carrier Services (as defined below).

2.      The Defendants are:  Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Mitsui O.S.K. Lines, Ltd., Mitsui O.S.K. Bulk Shipping (USA), Inc., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Toyofuji Shipping Co., Ltd., Wilh. Wilhelmsen Holding ASA, Wilh. Wilhelmsen ASA, Wallenius Lines AB, Wallenius Wilhelmsen Logistics AS, Wallenius Wilhelmsen Logistics Americas, LLC, EUKOR Car Carriers Inc., American Shipping & Logistics Group, Inc., American Roll-On Roll-Off Carrier, LLC, Compañía Sud Americana de Vapores S.A. and CSAV Agency North America, LLC.

3.      "Vehicle Carriers" are large ocean shipping vessels that transport freight with wheels ("wheeled freight") and can be rolled on and off of a ship. These vessels are known as roll on, roll off cargo ships ("Ro-Ro"). "Vehicle Carrier Services" refers to the market for the paid ocean transportation to, from and within the United States of wheeled freight on Ro-Ro ships. The Defendants provide, market, and/or sell Vehicle Carrier Services to, from and within the United States, including its territories and possessions.

4.      Competition authorities in the United States, the European Union, Canada and Japan have been investigating a possible global cartel among Vehicle Carriers since at least September 2012. The investigation includes the possibility of collusion, including price fixing and allocation of customers in the ocean shipping of wheeled freight including cars, trucks, construction equipment and other products.

5.      As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiff and the Class paid artificially inflated prices for Vehicle Carrier Services during the Class Period from January 1, 2008 through the present. Plaintiff and the Class seek to recover damages for the injuries sustained resulting from Defendants' illegal actions, and to enjoin Defendants' illegal conduct as alleged in this Complaint.

## II.    JURISDICTION AND VENUE

6.      Plaintiff brings this action against Defendants under Section 4 of the Clayton Act, 15 U.S.C. § 15, to enjoin Defendants' illegal conduct and recover treble damages and costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and the other members of the Class (as defined below) have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7.     The Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 1331 and 1337.

8.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in or are found or transact business in this District.

9.     The Court has personal jurisdiction over the Defendants because each, either directly or through the ownership and/or control of its subsidiaries: (a) transacted business in the United States, including in this District; (b) directly sold Vehicle Carrier Services throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

## III.   INTERSTATE TRADE AND COMMERCE

10.    During the Class Period, Defendants sold substantial quantities of Vehicle Carrier Services, including wheeled freight transported by Defendants to, from or within the United States.

11.    The activities of Defendants in connection with the sale of Vehicle Carrier Services, and the conduct of Defendants and their co-conspirators as alleged in this Complaint: (a) constituted United States domestic interstate trade or commerce; (b) constituted United States

import trade or import commerce; and/or (c) were within the flow of and had a direct, substantial, and reasonably foreseeable effect on United States domestic trade or commerce and/or United States import trade or commerce.  Given the marketing and sales by Defendants of Vehicle Carrier Services in the United States, and the volume of affected commerce, as alleged in this Complaint, such effects were direct and substantial.  In addition, it was reasonably foreseeable that Defendants' wrongful conduct, as alleged in this Complaint, would raise and artificially inflate prices for Vehicle Carrier Services sold in the United States, and would have an effect on United States domestic trade or commerce and/or United States import trade or commerce.

12.     Such effects, including the artificially raised and inflated prices that Plaintiffs and members of the proposed Class paid for Vehicle Carrier Services during the Class Period, caused antitrust injury in the United States to Plaintiffs and members of the proposed Class, and give rise to their claims under Section 1 of the Sherman Act.

13.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' Vehicle Carrier Services are sold in the flow of interstate commerce.

## IV.     PARTIES

### Plaintiff

14.     Plaintiff International Transport Management Corp. is a New Jersey corporation with its principal place of business located in Hoboken, New Jersey.  Plaintiff directly purchased Vehicle Carrier Services from one or more Defendants during the Class Period and was directly injured as a result.

**Defendants**

15.     Defendant Kawasaki Kisen Kaisha, Ltd. ("K" Line) is a Japanese company with its head office located in Tokyo, Japan. "K" Line, directly and/or through its wholly-owned and controlled subsidiaries, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

16.     Defendant "K" Line America, Inc. is a U.S.-based subsidiary of "K" Line with its headquarters located in Richmond, Virginia. "K" Line America, Inc. participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of "K" Line America, Inc. were under the control of its parent company.

17.     Defendants "K" Line and "K" Line America, Inc. will collectively be referred to herein as the ""K" Line Defendants."

18.     Defendant Mitsui O.S.K. Lines, Ltd. ("MOL") is a Japanese company with its head office located in Tokyo, Japan. MOL, directly and/or through its wholly-owned and controlled subsidiaries, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

19.     Defendant Mitsui O.S.K. Bulk Shipping (USA), Inc. ("MOB") is a U.S.-based subsidiary of MOL with its headquarters located in Jersey City, New Jersey. MOB participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period. At all

times during the Class Period, the activities of MOB were under the control and direction of its parent company.

20.     Defendants MOL and MOB will collectively be referred to herein as the "MOL Defendants."

21.     Defendant Nippon Yusen Kabushiki Kaisha ("NYK Line") is a Japanese company with its head office located in Tokyo, Japan.  NYK Line, directly and/or through its wholly-owned and controlled subsidiaries, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

22.     Defendant NYK Line (North America) Inc. ("NYK Line NA") is a principal subsidiary of NYK Line with its headquarters located in Secaucus, New Jersey. NYK Line NA participated in the conspiracy alleged in this Complaint and provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, the activities of NYK Line NA were under the control and direction of its parent company.

23.     Defendants NYK Line and NYK Line NA will collectively be referred to herein as the "NYK Defendants."

24.     Defendant Toyofuji Shipping Co., Ltd. ("Toyofuji") is a Japanese company with its head office located in Aichi, Japan.  Toyofuji, directly and/or through its wholly-owned and controlled subsidiaries, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

25.     Defendant Wilh. Wilhelmsen Holding ASA ("WWH") is a Norwegian company with its registered office located in Lysaker, Norway.  WWH, directly and/or through its wholly-owned and controlled subsidiaries, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

26.     Defendant Wilh. Wilhelmsen ASA ("WW ASA") is a Norwegian company located in Lysaker, Norway.  WW ASA, directly and/or through its wholly-owned and controlled subsidiaries, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

27.     Defendant Wallenius Lines AB ("Wallenius Lines") is a Swedish company with its principal place of business in Stockholm, Sweden.  Wallenius Lines AB, directly and/or through its wholly-owned and controlled subsidiaries and operating companies, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

28.     Defendant Wallenius Wilhelmsen Logistics AS ("WWL") is a Norwegian company with its head office located in Lysaker, Norway.  WWL is a joint venture between WW ASA and Wallenius Lines.  WWL, directly and/or through its wholly-owned and controlled subsidiaries and operating companies, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

29.     Defendant Wallenius Wilhelmsen Logistics Americas, LLC ("WWLA") is a U.S. based subsidiary of WWL and is located in Woodcliff Lake, New Jersey.  WWLA participated in

the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of WWLA were under the control and direction of its parent company.

30.     Defendant EUKOR Car Carriers Inc. (EUKOR) is a Korean company with its head office located in Seoul, South Korea, with branches in California and New Jersey. EUKOR is a joint venture between WW ASA, Wallenius Lines, Hyundai Motor Company and Kia Motors Corporation. EUKOR participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

31.     American Shipping & Logistics Group, Inc. ("ASL") is a United States-based company with its headquarters located in Park Ridge, New Jersey. ASL consists of several companies, including Defendant ARC (defined below), all of which are joint ventures between WW ASA and Wallenius Lines and based in the United States. ASL, directly and/or through its wholly-owned and controlled subsidiaries and operating companies, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

32.     American Roll-on Roll-Off Carrier, LLC ("ARC") is a United States-based company with its head office located in Park Ridge, New Jersey and is one of ASL's primary operative companies. ARC is the largest U.S. flag Ro-Ro carrier and the third largest U.S. flag carrier overall in international trade. ARC participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United

States, including in this District, during the Class Period.  At all times during the Class Period, the activities of ARC were under the control and direction of its parent company.

33.     Defendants WWH, WW ASA, Wallenius Lines, WWL, WWLA, EUKOR, ASL and ARC will collectively be referred to herein as the "WW Defendants."

34.     Defendant Compañía Sud Americana de Vapores S.A. ("CSAV") is a Chilean company with its head office located in Valparaíso, Chile.   It is the largest shipping company in Latin America.  CSAV, directly and/or through its wholly-owned and controlled subsidiaries, participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

35.     Defendant CSAV Agency North America, LLC ("CSAV Agency") is a wholly-owned subsidiary of CSAV, with its main office located in Iselin, New Jersey.  CSAV Agency participated in the conspiracy alleged in this Complaint and provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, the activities of CSAV Agency were under the control and direction of its parent company.

36.     Defendants CSAV and CSAV Agency will collectively be referred to herein as the "CSAV Defendants."

## V.     DEFENDANTS' AGENTS AND CO-CONSPIRATORS

37.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.  Each Defendant or co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for Vehicle Carrier Services sold by its parent company.

38.     When Plaintiff refers to a corporate family or companies by a single name in this Complaint, it is alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family.  The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

39.     Various partnerships, sole proprietors, firms and corporations not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in the furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

40.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## VI.    FACTUAL ALLEGATIONS

### A.    The Vehicle Carriers

41.     Ro-Ro shipping refers to the method by which any type of wheeled freight is loaded onto and off of large ocean shipping vessels for overseas transport.  The freight shipped

includes all types of vehicles, including cars, trucks, construction vehicles, treaded vehicles and machines, tractors, trailers and many more types of wheeled freight.

42.     Ro-Ro shipping is the preferred method of shipping smaller-wheeled freight that could also be shipped in multi-modal containers.  Ro-Ro shipping is necessarily the only economically viable and practical method for the ocean shipping of large numbers of vehicles and larger wheeled freight.

43.     In the United States, Ro-Ro shipping to the United States is limited to the major shipping ports.  According to the U.S. Department of Transportation, Maritime Administration, Vessel Calls Snapshot, 2011 (dated March 2013), New York/New Jersey had the third largest number of Ro-Ro vessel calls (ships docking at port to load or unload cargo) in the United States.

44.     There is a broader ocean shipping cargo market but Vehicle Carriers are a readily distinguishable and separate cargo market on the seas because:  (1) there are not many dual purpose ships; (2) it is not economically feasible to carry larger volumes or sizes of wheeled freight on container ships; (3) pricing methodologies between general cargo shipping (weight) and Vehicle Carrier Shipping (volume) differ; (4) Vehicle Carriers ship to the United States on fewer routes limited to major shipping ports; and (5) air transport alternatives are too costly. Therefore, there are no reasonable substitutes to Vehicle Carriers for the shipment of wheeled freight.

**B.      The Price Movements For Vehicle Carrier Services During the Class Period Are Consistent with Collusion, Not Competition**

45.     Prices for Vehicle Carrier Services have been generally increasing since 2006. Pricing for Vehicle Carrier services (per vehicle) was relatively flat from 2001 to 2006, but has been increasing since that time.  Between 2001 and 2006, per-vehicle price barely increased, from approximately $301.30 in 2001, to $305.79 in 2006.

46.     By contrast, prices for Vehicle Carrier Services have increased by approximately 23% from 2006 to 2012, more than the increase in demand during the Class Period. This increase is contrary to what economic principles would predict in a competitive market.

**C.     The Vehicle Carrier Services Market Structure and Characteristics Plausibly Support the Existence of Collusion**

47.     In addition to the price movements in this industry during the Class Period, several structural and other characteristics of the Vehicle Carrier Services market, including barriers to entry, the inelasticity of demand, the commodity-like nature of the services at issue, and the excess capacity in the market, together with Defendants' opportunities to meet and collude, and their history of previous collusion, further demonstrate the existence and plausibility of Defendants' conspiracy as alleged herein.

**1.     There Are High Barriers to Entry**

48.     When there are significant barriers to entry, new entrants are much less likely to enter the market. Under basic economic principles, when product prices rise above competitive levels, new entrants normally seek to benefit from the resulting supra-competitive margins. Barriers to entry help to facilitate the formation and continuance of a cartel and its supra-competitive pricing.

49.     Substantial barriers increase the difficulty of, and thus significantly reduce, entry into the Vehicle Carrier Services market. Vehicle Carrier ships are highly specialized in design which restricts them from multi-modal use. Any entrant would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing or acquiring a fleet of Vehicle Carriers, plus other equipment.

50.     The Vehicle Carrier Services industry requires the establishment of a network of routes to serve a particular set of customers with special needs and with whom Defendants have

established long-term relationships.  These established routes and long-term relationships increase switching costs for shippers, which poses another barrier for potential entrants.

51.     Defendants have utilized economies of scale: building more ships and increasing their size in order to lower sensitivity to fuel prices; and offering customers additional services, including dedicated port terminals and inland transportation.

### 2.     Vehicle Carrier Services Are A Highly Concentrated Industry

52.     Concentrated markets are more susceptible to collusion.

53.     Defendants dominate the Vehicle Carrier Services market.  They hold seven of the top ten spots by capacity (as of 2010)(source:  Dynamar – B.V. - https://www.dynamar.com/links#conferences)  and have had control of over 70 percent of the market during the Class Period.

### 3.     Vehicle Carrier Services Are Homogeneous and Commodity-Like

54.     Vehicle Carrier Services are a commodity-like service, and are interchangeable among Vehicle Carriers.  Vehicle Carrier Service customers make purchase decisions based primarily on price because each Defendant can provide the same or similar Vehicle Carrier Services to customers: qualitative differences amongst the services provided by Defendants are negligible.

55.     It is easier to form and continue an unlawful cartel when services are viewed as interchangeable and commodity-like by purchasers, because it is simpler for suppliers to coordinate prices, and they can more effectively police any agreement on prices.

### 4.     Demand for Vehicle Carrier Services is Inelastic

56.     Demand for Vehicle Carrier Services is highly inelastic because of the lack of close substitutes for this service.  Only a Ro-Ro ship is built to transport the large, voluminous

wheeled freight and to load and off-load this freight in a fast and efficient manner. Shipping vehicles, especially larger vehicles, by any other method including but not limited to container shipping, is not economically feasible.

57.    As a result of this price inelasticity, price increases in Vehicle Carrier Services do not induce purchasers to switch to other methods of shipping their wheeled freight. The lack of purchaser ability to substitute allows Defendants to significantly raise their prices without losing revenue and facilitates collusion.

### 5.    Demand Has Not Met Supply, Yet Prices Have Increased

58.    The Vehicle Carrier Services Market has operated with excess capacity since 2008 with a significant decline in fleet utilization rates. In 2007 the utilization rate approached 100 percent, but significant drops occurred thereafter, with utilization as low as 65 percent in 2009.

59.    Despite such excess capacity during the Class Period, Defendants created artificial capacity shortages by "slow steaming." This lowers the vessel's speed and conserves fuel costs. However, since it takes longer to arrive at port, Defendants have used more vessels at the same time which had the effect of decreasing capacity.

60.    Defendants also shared vessels (see ¶ 81). This action, coupled with slow steaming, reduced output despite overcapacity which caused prices to rise artificially.

61.    In fact, around the start of the Class Period, prices for Vehicle Carrier Services were rising, and increased more than 20 percent throughout the Class Period, after being flat for several years preceding the Class Period. These increases far outpaced any increase in demand and costs during the Class Period.

62.    But for the unlawful price-fixing conspiracy, the economics of supply and demand dictate that prices for Vehicle Carrier Services would not increase at a rate greater than the rate of demand.

### 6.    Defendants Have A History Of Collusion

63.    Certain of the Defendants, by and through their affiliates and subsidiaries, have pled guilty and been fined large sums of money for antitrust law violations in other markets.

64.    On March 18, 2009, the Japan Fair Trade Commission ("JFTC") ordered twelve companies to pay $94.7 million in fines for violations of the Japanese Antimonopoly Act. Among the twelve companies were "K" Line Logistics, Ltd., a subsidiary of Defendant "K" Line, Yusen Air & Sea Services Co., Ltd., a subsidiary of Defendant NYK Line, and MOL Logistics (Japan) Co., Ltd., a subsidiary of Defendant MOL.

65.    The JFTC concluded that the companies had, over a five-year period, met and agreed to, among other things, the amount of fuel surcharges, Automated Manifest System (AMS) surcharges, security charges, and explosives examination charges that they would impose on their international air freight forwarding customers.  The agreements were, according to the JFTC, negotiated at Executive Board of International Committee (EBIC) meetings of the Japan Aircargo Forwarders Association.

66.    On September 30, 2011, MOL Logistics (Japan) Co., Ltd. (a subsidiary of MOL) pleaded guilty to a Criminal Information in the United States District Court for the District of Columbia charging it with Sherman Act violations related to price fixing.  MOL is one of the 16 companies that agreed to plead guilty or have pled guilty as a result of the United States Department of Justice's ("DOJ") freight forwarding investigation, which has resulted in more than $120 million in criminal fines to date.

67.     On March 28, 2012, the European Commission ("EC") fined fourteen international groups of companies, including Yusen Shenda Air & Sea Service (Shanghai) Ltd., a subsidiary of Defendant NYK Line, a total of approximately $219 million for their participation in the air cargo cartels in violation of European Union antitrust rules.  According to the EC, "[i]n four distinct cartels, the cartelists established and coordinated four different surcharges and charging mechanisms, which are component elements of the final price billed to customers for these services."

68.     On March 8, 2013, the DOJ announced that "K" Line Logistics, Ltd. and Yusen Logistics Co., Ltd., a subsidiary of Defendant NYK Line, agreed to plead guilty and pay criminal fines of $3,507,246 and $15,428,207, respectively, for their roles in a conspiracy to fix certain freight-forwarding fees for cargo shipped by air from Japan to the United States.  As with MOL Logistics (Japan) Co. Ltd., "K" Line Logistics, Ltd. and Yusen Logistics Co., Ltd. pleaded guilty to meeting with co-conspirators, agreeing to what freight forwarding service fees should be charged on air cargo shipments, and actually levying those fees on their customers from about September 2002 until at least November 2007.

### 7.     Current Governmental Investigations

69.     United States, Canadian, Japanese, and European competition authorities have initiated a global, coordinated antitrust investigation concerning the unlawful conspiracy alleged herein.  The investigation originated in the United States after an American shipping company complained of Defendants' conspiracy to the DOJ.

70.     On September 6, 2012, the JFTC executed raids at the Japanese offices of Defendants NYK Line, MOL, "K" Line, WWL, and EUKOR as part of an investigation into anticompetitive conduct related to Vehicle Carrier Services.  Defendant "K" Line confirmed in a

statement to its shareholders, as part of its FY 2012 2nd Quarter report, that it was visited by a JFTC investigation team on suspicion of violating Japan's Antimonopoly Act in terms of transporting cars and wheeled construction machinery. Defendants NYK Line and MOL further confirmed that their Japanese offices had been searched.

71.     On September 7, 2012, The *Japan Daily Press* reported that a JFTC official said the cartel "was formed to deal with the rising fuel charges, personnel costs and shipbuilding expenses." According to the article, "apparently some companies formed smaller groups for specific shipping routes, such as for Europe, North America and other Asian nations" and the three major Japanese firms – NYK Line, "K" Line and MOL – played "a big role in this setup." "The scrupulous companies were controlling the competition and manipulating transport orders from carmakers."

72.     Defendant WW ASA confirmed in a press release on September 7, 2012 that it had received a request for information from the Canadian Competition Bureau ("CCB"), and that (i) its subsidiaries, WWL and EUKOR had been visited by the JFTC as part of an investigation related to the Japan Antimonopoly Act; (ii) WWL had received requests for information from the EC, DOJ and CCB; and (iii) EUKOR had received requests for information from the DOJ and the CCB. According to Defendant WW ASA, the purpose of the requests made to WWL and EUKOR "is to ascertain whether there is evidence of any infringement of competition law related to possible price cooperation between carriers and allocation of customers."

73.     On the same day, in coordination with United States and Japanese authorities, the EC carried out additional unannounced inspections at the European offices of several maritime shipping companies suspected of operating a cartel. According to the EC, it carried out the inspections in coordination with United States and Japanese competition authorities, and "ha[d]

reasons to believe that the companies concerned may have violated Article 101 of the Treaty on the Functioning of the European Union prohibiting cartels and restrictive business practices."

74.     The *Japanese Business Daily* reported that the shipping affiliates of Toyota Motor Corp., including Defendant ToyoFuji Shipping Co., Ltd., were also among the companies raided by the JFTC.

75.     Defendant CSAV issued a statement in mid-September, 2012 revealing that its employees had received subpoenas from the DOJ and CCB in connection with the suspected Vehicle Carrier Services cartel.  Defendant CSAV stated, "[t]he investigation seeks to inquire into the existence of antitrust law violations related to cooperation agreements on prices and allocation of clients between car carriers."

76.     The DOJ, through spokesperson Gina Talamona, confirmed to the media shortly after the September 2012 raids, "[w]e are coordinating with the European Commission, the Japanese Fair Trade Commission and other international competition authorities."  Ms. Talamona explained that "[t]he antitrust division is investigating the possibility of anticompetitive practices involving the ocean shipping of cars, trucks, construction equipment, and other products."

**8.      Defendants Had Multiple Opportunities to Meet in Secret and Conspire**

77.     The shipping industry has been characterized as a "small world" where "many of the key figures ... know each other."  Among the key figures noted are NYK Line president, Yasumi Kudo, MOL's president, Koichi Muto, and "K" Line's president, Kenichi Kuroya. *Lloyd's List 100 most influential people in shipping.*

78.     The Defendants routinely enter into joint "vessel sharing" or "space charter" agreements.  These agreements allow shipping lines to reserve amounts of space or "slots" on

one another's ships.  Vessel sharing agreements are very common in the international maritime

shipping industry, comprising approximately 79% of all agreements registered with the Federal

Maritime Commission ("FMC").  While allegedly entered into to optimize capacity utilization

and increase efficiency, these agreements provide an opportunity for Defendants to discuss

Vehicle Carrier shipping markets, routes, and rates and to engage in illegal price fixing and

customer allocation conspiracies.

79.     Defendants NYK Line and "K" Line are members of the Transpacific

Stabilization Agreement ("TSA").  Its website states that "TSA carriers discuss trade conditions

and agree on the need for common, recommended pricing and service goals" and that it provides

a forum to "[m]eet, exchange market information, and jointly conduct market research… and …

develop voluntary, non-binding guidelines for rates and charges."  (*See* "About TSA" at

http://www.tsacarriers.org/about.html.).

80.     Defendants "K" Line, MOL, NYK Line NA, and WWLA are all members of the

New York Shipping Association, Inc.

81.     Defendants CSAV (through its subsidiary CSAV Group North America), NYK

Line North America, "K" Line America, Inc., MOL (through its subsidiary, MOL (America),

Inc.), and WWLA are all members of the United States Maritime Alliance, Ltd. ("USMX").

82.     Defendants "K" Line, MOL (through its subsidiary MOL (America) Inc., NYK

Line, and WWL are all members of the Pacific Maritime Association.

83.     Defendants CSAV, "K" Line, MOL, NYK Line, and WWL are all members of

the World Shipping Council.

84.     Defendants CSAV, "K" Line, MOL, and NYK Line were all members of the

European Liner Affairs Association, which has been absorbed by the World Shipping Council.

85.    During the Class Period Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary to the operation and furtherance of the conspiracy.  For example, there are frequent trade shows for shipping companies around the globe, such as the Breakbulk conferences and the biennial Ro-Ro trade show in Europe.

## VII.    CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action on behalf of itself and as a class action under the Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) on behalf of the following Class (the "Class"):

> All persons and entities in the United States that purchased Vehicle Carrier Services directly from any Defendant (or any current or former subsidiary or affiliate thereof) or any of Defendants' agents or co-conspirators between January 1, 2008 and the present. This Class excludes any judicial officer who is assigned to hear any aspect of this action, Defendants, their agents and co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

87.    Plaintiff believes that there are hundreds or thousands of Class members as above described, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

88.    There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices for Vehicle Carrier Services and/or engaged in market allocation for these services sold in the United States;

   b.      The identity of the participants in the conspiracy;

   c.      The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their agents and co-conspirators in furtherance of the conspiracy;

   d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

   e.      Whether the conduct of Defendants and their agents and co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

   f.      The effect of Defendants' conspiracy on the prices of Vehicle Carrier Services sold in the United States during the Class Period; and

   g.      The appropriate measure of damages sustained by Plaintiff and other members of the Class.

   89.    Plaintiff is a direct purchaser of Vehicle Carrier Services and its interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

   90.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

   91.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

92.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

93.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable through the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VIII.   ACCRUAL OF PLAINTIFF'S CAUSE OF ACTION AND EQUITABLE TOLLING

94.    Plaintiff had no knowledge that it had been injured by the combination and conspiracy alleged herein, or of facts sufficient to constitute actual or constructive inquiry notice of an illegal agreement among Defendants, until shortly before the filing of the Complaint.

95.    Plaintiff had no reason to know of any illegal agreement until no sooner than the announcement of the global investigation on September 6, 2012, which constituted the first public notice that a horizontal conspiracy among competitors may have injured purchasers of Vehicle Carrier Services.

96.     Accordingly, the applicable statute of limitations does not constitute a bar to the claims set forth herein or to damages for any portion of the Class Period asserted in this Complaint for the following reasons:

a.     Before September 6, 2012, no information, actual or constructive, was ever made available to Plaintiff and members of the Class sufficient to constitute actual or constructive inquiry notice that they were being injured by Defendants' unlawful conduct.

b.     By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing.  Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any direct purchasers with whom they did business.

c.     Plaintiff and members of the Class could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

d.     Through their annual reports, and otherwise, Defendants affirmatively and fraudulently concealed their conspiracy by, *inter alia*, publicly stating that the Vehicle Carrier Services market was "very competitive" (CSAV Annual Report 2010, pgs. 15, 25); prices rose based on supply and demand (NYK Line Annual Report 2009, p. 8); and competition was fair and transparent (K Line Annual Report 2009, p. 1).

## IX.   CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1

97.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

98.     Defendants and their agents and co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

99.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

100.     Beginning at least as early as January 1, 2008, and continuing until such time as the anticompetitive effects of Defendants' conduct ceased, the exact dates being unknown to Plaintiff, Defendants and their agents and co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Vehicle Carrier Services in the United States and its territories and possessions, and to allocate customers and markets for Vehicle Carrier Services, thereby creating anticompetitive effects.

101.     Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Vehicle Carrier Services throughout the United States.

102.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Vehicle Carrier Services.

103.   As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for Vehicle Carrier Services.

104.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their agents and co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth in the Complaint.

105.   Defendants' conspiracy had the following effects, among others:

a.   Price competition in the market for Vehicle Carrier Services has been restrained, suppressed, and/or eliminated in the United States;

b.   Prices for Vehicle Carrier Services sold by Defendants, their divisions, subsidiaries, and affiliates, and their agents and co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

c.   Plaintiff and members of the Class who purchased Vehicle Carrier Services from Defendants, their divisions, subsidiaries, and affiliates, and their agents and co-conspirators have been deprived of the benefits of free and open competition.

106.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for Vehicle Carrier Services than they would have paid and will pay in the absence of the conspiracy.

107.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.      That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and that Plaintiff be deemed an adequate representative of the Class.

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their agents and co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

C.      That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

D.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

E.      That Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

Dated:  New York, New York
       August 30, 2013

Respectfully submitted,
McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP

By: *Lewis H. Goldfarb*

Albert J. Pucciarelli (AP1040)
Lewis H. Goldfarb (LG5470)
88 Pine Street, 24th Floor
New York, NY   10005
Tel:  (212) 483-9490
apucciarelli@mdmc-law.com
lgoldfarb@mdmc-law.com

| | |
|---|---|
| Michael J. Freed<br>Steven A. Kanner<br>Michael L. Silverman<br>2201 Waukegan Road, Suite 130<br>FREED KANNER LONDON<br>& MILLEN LLC<br>Bannockburn, IL   60015<br>Tele:  (224) 632-4500<br>mfreed@fklmlaw.com<br>skanner@fklmlaw.com<br>msilverman@fklmlaw.com | Eugene A. Spector<br>Jeffrey J. Corrigan<br>Jay S. Cohen<br>Rachel E. Kopp<br>SPECTOR ROSEMAN KODROFF<br>& WILLIS, P.C.<br>1818 Market Street, Suite 2500<br>Philadelphia, PA   19103<br>Tel:  (215) 496-0300<br>espector@srkw-law.com<br>jcorrigan@srkw-law.com<br>jcohen@srkw-law.com<br>rkopp@srkw-law.com |
| Lee Albert<br>Gregory B. Linkh<br>GLANCY BINKOW &<br>GOLDBERG, LLP<br>122 East 42nd Street – Suite 2920<br>New York, NY   10168<br>Tel:  (212) 682-5340<br>lalbert@glancylaw.com<br>glinkh@glancylaw.com | W. Joseph Bruckner<br>Heidi M. Silton<br>LOCKRIDGE GRINDAL<br>NAUEN P.L.L.P.<br>Suite 2200<br>100 Washington Avenue South<br>Minneapolis, MN   55401<br>Tel:  (612) 339-6900<br>wjbruckner@locklaw.com<br>hmsilton@locklaw.com |

Attorneys for Plaintiff, International Transport Management Corp.